The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Okay, good morning everyone. The first argued case is number 20-1399, New Vision Gaming v. SG Gaming. Mr. Dowd. Good morning, your honors, and may it please the court. My name is Matthew Dowd, and I, along with my colleagues Robert Scheffel and David Boundy, represent the appellant, New Vision Gaming. We are appealing the board's decision in two CBM proceedings, and we are asking for this court to vacate the board's decision on several grounds. I would like to start with our due process argument in terms of the structural bias that is associated with the current funding and payment system associated with the initial decision making of AI proceedings. Counsel, before you get to due process, under the doctrine of constitutional avoidance, if there's another way to resolve this case, we ought to do so, correct? Judge Moore, there is that concern about constitutional avoidance, but that doctrine applies primarily in cases where the court is being asked to invalidate a statute as being contrary to the Constitution. In this particular case, that is not what we're asking. Counsel, you're asking us to declare something unconstitutional, is that correct? Judge Moore, correct. We're asking that the internal agency procedures that have been the due process clause of the Constitution, so in that respect, yes. In terms of your initial question, though, the constitutional avoidance doctrine, again, primarily applies to situations where a court is asked to strike down... You have any Supreme Court cases, Mr. Dow, that suggest that the doctrine of constitutional avoidance doesn't apply when you're asking us to render unconstitutional an internal agency procedure as opposed to rendering unconstitutional a statute? Your Honor, I don't have any available at the moment. I'm happy to supplement after argument. Okay. Counsel, let's assume that I believe, under the doctrine of constitutional avoidance, that if there's a way to resolve a case that doesn't require reaching a constitutional issue, that I should do so. Are there arguments you've made in this case for why we should vacate and remand that don't require us to decide a new constitutional issue? Judge Moore, I would emphasize that... Let me say one point. Answer my question first, and you can say whatever you want. Are there issues you've presented in this case that would allow us to vacate and remand without reaching a new constitutional issue? I don't believe so, Your Honor, because what we've argued is that... Are you now... Mr. Dow, are you now abandoning your Arthrex challenge? No, we are not abandoning... So you're not abandoning your Arthrex challenge. We have already decided Arthrex, so it does not involve our deciding a new constitutional issue. It's simply applying Arthrex to the facts of this case. Would that not allow us to vacate and remand without reaching a new constitutional issue? Judge Moore, I think perhaps you're correct. Sorry, when you were asking your question, I wasn't thinking in terms of that angle of our arguments. I understand my colleagues on the other side have presented that argument. There is merit to that. So to the extent that the court would decide that, based on the current application of this court's Arthrex decision, that this case can be decided, remanded to the board, and then avoid the due process argument, I believe that you are correct. I don't have... Like I said before, I don't have authority one way or the other. The difficulty with that, I believe, is that it leaves the due process argument unresolved. My colleagues on the other side haven't necessarily... I don't believe they've argued in their briefs the... or pressed the argument of constitutional avoidance. They have suggested, to be fair, they have suggested that the case can be remanded under Arthrex. So we don't necessarily disagree with that. But in terms of deciding the due process argument, it leaves that an open question, and it doesn't address the problem with both the arguments that we raised on the due process and then the forms question clause, which, if I've answered your question, I would like to turn to those two issues today. And I will... Okay, yes. Please turn to those issues. So I'll turn first to the due process problems in this case, and I would start with what this court said in PAPLEX over 30 years ago, when Gordon Gould raised questions about the noted that there was merit in some of the concerns expressed by Gould. And what we would say is that those concerns are amplified, given the unique structure of the AIA proceedings, the way the institution decisions are made, the way the... Can you start getting into what you think is the concrete mechanism of biasing the board members' decisions exercising delegated institution authority? And Judge Sharonda, I think that there are at least several points. I think the strongest argument, though, is when you look at that as a whole. And I could start with the leadership APJ, and as a concrete example, what occurred in the Hulu case when that was remanded. And so we have a situation where a panel made a decision one way, and the panel decided that the case should not be instituted. The presidential opinion panel then stepped in and effectively overruled the APJ panel, the initial panel. And then since then, the panel has now instituted in that case. And that's an example where you have the chief APJ, who is essentially wearing the two hats. That's similar to a situation the Supreme Court identified in Ward v. Village of Monroe. Okay. And what is the chief APJ's structural bias? So the chief APJ, his structural bias is wearing the two hats, both as adjudicator and as running the PTAB as a business unit within an agency that is run as a business. And this is one of the key distinctions that makes this case one both unique compared to the other precedent that has been decided both by the Supreme Court and other regional circuit courts. And it also distinguishes this case from how the court dealt with the PTO's process and the re-exam process in PADLEX. Since 1992, then in 1999, and then again in 2011, the law has changed the way the PTO is funded such that it's run as a business unit and the PTAB, and this is in the PTO's own documents, and the PTO doesn't dispute this, that it's essentially running as a business unit, so money in, money out. The chief APJ knows that its budget is tied to the revenue associated with the institution decision-making, which accounts for 40% of the PTAB's AIA budget and there's 25% of the PTAB's overall budget. And when we look at those percentages in similar cases, such as Rose v. Village of Peninsula, where the district court in Ohio struck down a mayor's court, and one of the key points that it relied on was that an administrator who was also wearing two hats... Counsel, this is Judge Moore. Did you raise the due process challenges before the agency? Your Honor, we did not, and we acknowledge that we did not. And I think our colleagues on the other side asked for several points on that. Our response to that is twofold. When New Vision was responding to the CBM, the documents from the PTO revealing the full extent of the structural bias were not available. And second, probably more than twofold, but second is that I'm not entirely sure how New Vision could have gotten the documents during the PTAB proceeding or even entered them into the PTAB proceeding. And then the third is, and I think this is most important, is that there's really no dispute about the veracity or authenticity of the documents that we've provided that were provided by the PTO from a FOIA request. And I understand that this court guards the waiver issue, and rightfully so. Just this past week in the Qualcomm versus Apple case, the court decided a standing issue that wasn't raised below. The waiver is somewhat prudential. When it's a legal issue and there are no disputes of fact, the court... But Counsel, this isn't a legal issue. It's a constitutional issue. Don't you think that there's a difference there? I mean, constitutional avoidance would, I think, suggest we ought not to decide a constitutional issue raised for the first time on appeal. Judge Moore, I won't disagree that that's where the weight of authority lies. In most cases, not all cases, but in most cases, the appellate court is on firm ground to avoid deciding a constitutional issue for the first time. But at the same time, this case is not so different from what happened in Arthrex itself. Is this a case in which had the issue been raised to the board and you filed a brief to the board, which got sent up the chain to the chief APJ and to the director and they looked at it, could anybody have done anything to eliminate what you say is a constitutional biasing effect from the institution decision in your particular case? Or do you think that all of those officials' hands were tied and they couldn't do anything about it, which was not an insignificant aspect of why we decided the Arthrex matter? Judge Taranto, I'll answer your question in two ways. From a practical perspective, I think that there's little doubt that had we raised this issue before the PTAP, the outcome would have been that the panel would have decided that there was no institutional bias. I also question whether there would be any availability to run the issue up the chain, as you say. And if that were the case, that would actually only amplify our concerns, because what we're saying is that there's this institutional bias in terms of ensuring from the APJ leadership that enough funds flow to continue. Can I just ask, didn't you say, I think it's maybe on page 57 of your brief, that the PTO on its own accord can fix this bias problem? Judge Taranto, correct. We did say that they can fix it. Now, we didn't say that they would or could fix it within the context of any particular CBM proceeding or AI proceeding. I think those are two different issues. From a practical standpoint, this would involve a more elaborate evaluation of what sort of funding mechanism or what sort of process, and at the same time, ensuring that there isn't an institutional bias side one way or the other. I don't understand that to be able to have been decided within the context of anything. I see that I'm into my rebuttal time. Now, please continue the thought, and then I'm going to ask you also to tell us briefly about the forum selection issue. So, please continue. All right. Thank you, Judge Newman. So, what I would say is that the PTO can fix it. We believe that they should fix it, and the best way would be through perhaps some rulemaking process. We haven't provided a solution to it, to the current problem. Perhaps it could be by dividing the decision-making between and putting a wall between the APJs who decide the institution decision versus deciding the merits on the final written decision. So, yes, we agree that the PTO and the agency can fix it, but we disagree that there would be any way, either practically or legally, to fix it within the context of an AI proceeding. And then one last point on your question, Judge Toronto, is that there is case law, and we have cited in our brief, that questions whether a board or a panel or a judge who is accused or suggested of being structurally biased can, in fact, solve the problem. Ultimately, at the end of the day, and we cite concrete pipe, the Supreme Court case that the injury itself is being submitted. The actual injury, the constitutional injury, is the fact that your client, your proceeding is submitted to an adjudicator who has potential bias. Can I just pursue that for one more minute? Just elaborate for me on how this works. I mean, if there's a bias by the decision makers, at least maybe the initial decision makers, in favor of saying yes to the institution question as opposed to no, do I understand your theory is that that is because somehow they or others in a position to influence them get more money if they say yes rather than no? And wouldn't that require a comparison of what they or the other powers that be would be doing if they said no and moved on to other matters in front of the office? Isn't your argument dependent on some kind of comparison like that, which I don't remember seeing any demonstration of? If there's plenty of business to go around and they don't do the trial, as it's called, they would be doing something else. How do we know that relevant people make less money if they do something else instead of going on to the final written decision? Judge Toronto, I think your question touches a little bit about trying to show actual bias, which the Supreme Court, both in Toomey and Ward, have said you don't have to show actual bias. But what I would point to is if you look at the trend, and this is two points, Your Honor, if you look at the trend of institution rates, we cited a graph that was provided by the PTO. And when you look at the institution rates early on, like the first year or so, the institution rates were extraordinarily high. And if we do want to extend the discussion to consideration of actual proof, then we would argue, but we haven't argued because we don't think we need to argue, but we would argue that that data point suggests that at that time, the board felt the need to fill up the pipeline to ensure that there was work for the APJs. Now, I'll also offer this, currently it's a counterfactual in that the facts don't necessarily, we haven't gotten there yet. But take, for example, a situation where, and my colleagues on the other side explained that institution rates are declining, and we don't disagree with that. But if we get to the point that institution rates are declining so much whereby customers, like the PTO customers, stop using this process, that will be problematic. And that, it goes more to the structure of- Is there any case in this area, either of the, any of the three Supreme Court cases, I guess all of them involve mayors, and two of them found a problem, right? And one of them didn't. Is there any case that finds an unconstitutional structural bias, not based on an individual adjudicator's possible self-enrichment, but on this more general idea of wanting to help be part of a growing administrative empire? Is there any case like that? Judge Trotka, I'd say that there is no exact case on point or on all fours, given the facts that we have in this case, because, again, the current funding situation for the PTO is extraordinarily unique. The closest case I do think is Patlex, right? But- Tell me about why this is meaningfully different from the D.C. Circuit's FERC case. Sure. Delaware Riverkeeper, Your Honor. And so, there are important distinctions. In that case, the D.C. Circuit emphasized that FERC's funding was entirely beholden on Congress's appropriations. Is that not true? Is that not true here? So, I know my colleague from the PTO argues it's true, but from a practical perspective, and this is where it becomes important to understand that the issue is just not causing bias, but the appearance of whether the process is unbiased or not. Here, we know for a fact that for the past several years, the PTO, through the current statutory scheme, essentially gets all of the money that it generates through its decisions. Because Congress each year decides that that's a good idea. Yes. Correct. And that's what Congress wanted it to do. They structured it so that essentially the revenues that are generated one year become the budget for next year. Am I remembering right that the statute allows this special treasury fund to be spent by the PTO only subject to an appropriation? I may not have quite the language to be quoting, but I thought it's in substance subject to the appropriation. Otherwise, there might be an anti-assignment offense being committed. Correct, Judge Toronto. I believe you're correct. I don't know if that's the precise language, but I believe... So, I think I'm remembering right, and the government can correct me if I'm wrong, that the government, I think, has several responses, but I think it's the government's view that it is a sufficient response that ultimately Congress is in charge of all of this. And as long as Congress is in charge of all of this, the structural bias that was found improper in the two Supreme Court cases, at least, just isn't present, full stop. That everything else is just too attenuated, complicated, otherwise insufficient. Right. So, Judge Toronto, I don't think that's quite right in terms of how the Supreme Court decided to meet Ward, and also more getting back to Delaware Riverkeeper. It wasn't the fact that Congress said it was okay. I said, if that were really the holding, then we could get to the next step where, well, if Congress says anything is okay, then you can't have a violation of due process, but we know that's not correct. What the D.C. Circuit pointed out in particular in Delaware Riverkeeper was that it was too tenuous because the agency essentially had no expectation that they would receive funds if they started granting permits under its authority to raise more money. That is not the situation here. And here's another important distinction between, well, two more important our case and Delaware Riverkeeper. One, there was no indication that in that case, any of the adjudicators were or had the potential to get bonuses based on productivity. We do have that here. There is also, and that particular point, again, also distinguishes... Let me just ask. So, part, I guess, of what I was thinking is something like this, just correct the picture. If you look at the individual APJs, they might get bonuses, but they're not in any way in charge of the money. On the other hand, there are two possible people in charge of the money, I suppose, again, correct me if I'm wrong, the chief APJ and the director, but they're not going to get bonuses. So, as long as both those things are true and there's not in one hand the power to make the decision, get bonuses, and control the money, why doesn't that eliminate the problem? So, Judge Toronto, I think it's the last point, the second point about the folks who are in charge of the money not getting bonuses, which I think is not quite right with... Is the director going to get money? Let me correct what I just said. It's not... I agree with that proposition, but it's not consistent with what the Supreme Court said in Ward because, note, the Ward, the mayor didn't have any personal financial interest. It was the fact that he was wearing two hats and then making decisions that would benefit the village council in that case. But, in our case, it's the fact that we have leadership APJs who are making the judicatory decisions and also making decisions about the finances. So, in Ward, and this is also identified, I believe it was in Marshall versus Jericho as well, but you don't have to have a direct pecuniary interest to see a due process violation. Mr. Dowd, this is Judge Moore, why doesn't 314D bar judicial review of your form selection clause issue? Well, Judge Moore, I think our argument is that our review is something that is not associated with the merits of the institution decision. We believe, if you read QOZO, QOZO specifically carves out, or I think it's SAS or QOZO, APA review under 706A or C. 706A deals with arbitrary and capricious. What we're saying here is that it is arbitrary and capricious for the board to completely ignore the forum selection clause. And when you read the board's decision, both the initial decision at appendix zero, page seven and eight, and then if you look again at appendix, I believe it's 77, the board gave zero consideration to the forum selection clause. The other side doesn't dispute that there was a forum selection clause. The other side doesn't dispute that they were barred from bringing a PTAP decision. What we're saying is that it's an abuse of discretion to undertake an erroneous legal analysis. And that's what has happened here. And that erroneous legal analysis essentially has nothing to do with the merits of patentability or the other cases that this court has decided. Now, if you do decide that the court doesn't have jurisdiction to review that type of dispute, and it should be dismissed, then we understand. But up until this point, this court, I don't believe, has ever gone that far to say that the board can entirely ignore a forum selection clause. And that's what we're saying. That's the answer to your question, Judge Moore. And I know I've gone... Well, let's take another moment on the merits of the forum selection issue on the assumption that we may feel that we need to resolve it. Okay, Judge Newman. Alissa, the question, what I would say is that I know the case, the federal circuit has decided the DODO case. And what the PTAP did, in our view, is essentially say that the PTAP has no ability to even consider the forum selection clause. And what we're saying is that the proper legal analysis, again, not doing anything with the merits of the likelihood of success on invalidating any claims, was whether this particular party was, in fact, a party that could have and was permitted to bring a PTAP proceeding. Under the agreement, SG contracted away that right for valuable consideration. We have a problem with a board's analysis when it condones a private party's action that is, in essence, a breach of that contract. In my view, I don't see anywhere in the AIA where Congress intended to enable a federal agency to then enable a private party to breach a private contract. This is not a question about whether SG Gaiman would have or was likely to proceed on the merits of its petition. It was a question that was completely divorced from the substance of patentability or patent eligibility. And on that front, we see that this case is distinguishable from this court's prior precedent. We haven't seen any case, maybe there's a case pending, but I'm not aware of any case that has gone so far to say and to authorize the board to completely disregard a forum selection clause. Now, I understand my colleague, then that will be the law, but until now, I'm not aware of any precedent that so holds. Okay. All right. Let's hear from the other side. We'll save you a rebuttal, Mr. Dodd. Thank you, Your Honor. Okay. We'll hear from Ms. Karasvang. May it please the court. I'm Dana Karasvang for the government, and I'm here to address the constitutional and reviewability issues, sharing time with SG Gaiman. I'd like to start with the structural due process argument, which, as I think the court noted, is waived. That whole argument is based on a factual premise, that APJs have some kind of incentive to institute when they shouldn't. And there's no record here, because they didn't present this to APJs, who are the people who know best how their compensation works and what incentives they face. Do you think that you can't win or shouldn't win on the current record? No, we absolutely win on the current record. There are three facts that we all know to be true, and they settle this case. The first, APJs do not make more money if they institute. An institution decision counts exactly the same as a non-institution in the performance review process. Also, these proceedings are currently being conducted at a loss, and the PTAD has more than enough work. The APJs have all the assignments that they want. Right, but how do you reconcile this with the widespread bonus system for APJs? Yeah, so the APJ bonus system, just like the mayor in Dugan, APJs get paid the same amount, no matter how they decide their decision. Their performance reviews take into account the number of decisions that they issue as one of four factors, but not the outcome. It is not unconstitutional to have a bonus system that rewards people who work hard and do good work. In that process, a decision to institute counts exactly the same as a decision not to institute. What percentage of the APJs receive a bonus, a year-end bonus? Yeah, you know, again, that goes back to the value of having a record, because I don't think the answer to that is in those records. No, that's a simple matter of arithmetic. All of this is on the public record. I just haven't done any calculations. So, do you know the answer? I believe it's about two-thirds of APJs receive a bonus. Again, these are small bonuses. They're less than 6% of the average APJ's pay. And one of the factors is the amount of work the APJ does, but the PPAP has plenty of work. They have a backlog of over 7,000 ex parte appeals, and the APJs get decisional unit credit for those as well. Their AA petitions are increasing. There are other kinds of work that you can do that also gets taken into account in the performance review system, rulemaking. Isn't the bonus pool for APJs and the way in which it's allocated awfully similar to the same one that exists for examiners? And if we were to reach this and suggest there's a problem, couldn't it potentially be an incredibly widespread problem and not just limited to APJs? I guess my question is, isn't the way you all do these bonuses for APJs awfully similar to the way you do it for all the employees at the office? There are a lot of similarities. Yes, Your Honor. The effect of a structural due process decision here could be very concerning. It's always easy to allege that somebody has some incentive because everything an agency does that indirectly affects the agency and in some sense, the agency staff. And you can always draw some kind of chain of reasoning. And agencies would be really hamstrung if it worked that way. And that's why the Supreme Court has looked for a direct substantial pecuniary link or really direct control over the finances. Well, what was the direct link in Ward? And then also just so I don't forget, at least as I was writing down, you said you had three things that were sufficient now without a factual record. And I got the first two. They don't make more money by saying yay as opposed to nay. They got plenty of work so they're not losing out and sitting idly so they can't make their quota. But I didn't get the third thing or you may have said it, but I didn't write it down. The third one is these proceedings are currently being conducted at a loss. So, if you're worried about the agency's budget and trying to pad the agency's coffers, you wouldn't do it by having more proceedings that are being conducted at a loss. Okay, now about Ward. Yes. So, in terms of control over money, we have Ward on the one hand, that was one person. The control over the finances was responsible for the finances. The touchstone of this case is really Dugan. In Dugan, the mayor was- I think Mr. Dowd said that in Ward, the mayor was not personally getting richer by making more of these decisions. So, which I gather you don't disagree with, that there wasn't a personal enrichment of the mayor. What was the mechanism by which the Supreme Court, that the mechanism of bias for the mayor in that case, that isn't present here? Yes. So, in Ward, the Supreme Court said that that mayor who was solely responsible and accountable for the city's finances and was making the decisions, he wasn't enriching himself, but because of, you know, it all came down to him, he was accountable for the finances, that that was enough. But there are two cases from the Supreme Court where the mayor wasn't being enriched. And on one hand, we have Ward. On the other hand, we have Dugan. And that's really our touchstone here. The mayor in Dugan wasn't solely responsible. He was a member of a five-person board that decided what to do with the money. And one of the things the board did with that money was pay his salary. And the Supreme Court said that isn't enough. That isn't enough control. And this argument that something is good for the agency as a whole is one... Oh, I see... Please continue. Please answer the question. Okay. So, this argument that something that is good for the agency as a whole is something that has been rejected over and over, starting with Dugan, where, you know, the town does better with money and the mayor can ask for a future raise if there's more money in the budget. Also, Delaware Riverkeeper, the D.C. Circuit said, you know, sure, more pipelines might mean more money, but it wouldn't be consistent with Dugan to call that a structural due process problem. In Kaipat, the Ninth Circuit addressed the case where money went to build the judges a nice new courthouse. And the Ninth Circuit said, you know, judges are only human. Obviously, they would prefer a nice new courthouse. That doesn't create a structural due process problem. In Doolin, the money went to fill the agency's depleted insurance fund. The Fourth Circuit said that's not a problem. Van Parkin, parking ticket adjudicators got contracts from the director of revenue who would think of an incentive to take on revenue. The Seventh Circuit said, you know, the mere fact that an administrative or adjudicative body derives financial benefit from the fines and penalties imposed is not, in general, a violation of due process. So, I could go on. There are a lot of these cases rejecting this argument. There are none accepting it. The APJs, even the three in leadership roles, have nothing like the level of direct control, even that was present in Dugan, where the mayor was in a room with five other people who are making the decision. Right? They prepare a budgetary proposal. Can I just ask this question? So, the institution decision that the APJs are making is they are of the director. Does that play a role? That is, if one just treated these decisions as the director because the director can withdraw the delegation at any time. Would that make any difference? Well, if the argument is that the director who manages an agency with a $3 billion budget would want to make the PTO look bad by erroneously instituting proceedings to get $27,000 from the agency, that's not credible. But even the director has far less influence over this than the mayor in Dugan, which the Supreme Court told us it wasn't enough, where it was one person and a five-member board. Right? The director has to work with Department of Commerce. It has to work with the advisory committees, submit the budget to OMB. The president ultimately sends it to Congress. Congress ultimately decides how much money the agency gets. The agency can't spend more than is appropriated. That's 35 U.S.C., 42 C.1. So, this is a much more complicated scheme than the five-person board in Dugan, which we know isn't enough. And it's not really a federal spending is, that the four cases courts of appeals have seen involving the federal government, the courts of appeals have never found a structural due process problem in a federal process. That's the D.C. Circuit in Riverkeeper, this court in Patelec, the Fourth Circuit in Doolin, and the Fifth Circuit in Benitez Villafuerte. So, if there are no... I'm happy to answer other questions, but I know I'm well over the time, but I agree, too, with counsel for S.G. Gainey. Okay. Any more questions for Ms. Gershwine? Not for me. All right. Thank you. Okay. Judge Brewer? We'll hear from Mr. Kelly. May it please the court. Good morning, Your Honors. I will start with the forum selection clause issue. Mr. Dowd said this morning that the board completely ignored the forum selection clause. That's not true. The board analyzed the forum selection clause on the terms that New Vision argued it, which was that the board could not institute the review. Nowhere, anywhere, before the board, did New Vision argue that the board should exercise its discretion to deny the petition. That simply wasn't argued. Is that a significant distinction? Isn't it to choose a forum for adjudication of certain issues? Well, Your Honor, the distinction I was making was the distinction between deciding an issue that New Vision raised and speculating on a different argument New Vision could have raised. Yes. I agree. My question for you is, does that end it? It ends it here. Yes, Your Honor. So, the problem with the forum selection clause... Is it possibly wrong? Let's say we accept all of this, decide for one reason or another that perhaps it needs to go back, and the board then conducts a full trial in all of the proceedings and all else, and eventually we reach a tribunal that has authority to look at the forum selection clause and decides you're in the wrong forum. Your Honor, respectfully, the jurisdiction of this court is to review the board's decision, and Congress in Section 314D has said institution decisions are not reviewable. So, putting aside for a second the merits of the board's analysis of the forum selection clause issue as New Vision argued it, that's simply not appealable at this point. That's an institution decision that's not appealable. And so, I would push back on Your Honor's premise that this court is the tribunal in which this issue can be re-litigated. But again, what they're attempting to re-litigate is something they never even argued to the board. They never mentioned a discretionary denial possibility. And it's not that they couldn't have raised that issue. We cited before the board a board decision called Dot Hill, and the analysis of that decision is in the joint appendix at pages 986 to 988. And you'll see there the board was confronted with a similar issue where the party made two arguments. The party first said... So, where in your theory would the forum selection issue ultimately be decided? Who has authority to review that question? Well, the scope of the forum selection clause issue should be decided by a court competent to review that, which would be a district court. And specifically, the district court that the collateral case was already in front of. But I would point out to Your Honor that at the time at which this underlying the CDMs were instituted, New Vision went back to that court, that district court in Nevada. And they didn't say, hey, stop what SG Gaming is doing. They said, please stay your proceedings. Stop what you're doing here in Nevada, because the board is going to review the patentability issue. And that's a more efficient way of doing it. That's not what we said. It's what New Vision said. And that's in their opening brief at page 13. They requested a stay. So, Your Honor, is there a method for a patentee like New Vision to approach this case differently? There may have been. May I continue? Please continue. Thank you. There may have been a way for them to handle it. And we see an example of that in the Dodo case situation, where the party got an injunction. And in fact, the petitioner withdrew the petition. But here, that's not what happened. They didn't go to the district court and seek any relief like that. They sought the opposite type of relief. And Your Honor, just boldly speculate. Yes. The CTO always has the discretion not to entertain a particular IPR for almost any reason or in this case, a CBM. Isn't that right? Your Honor, I can't agree that they have the discretion to deny a petition for any reason. I know that that might be their position. I don't necessarily agree with that. But yes, they have discretion. This court has said it. And I'll agree that the discretion is broad. Okay. So, they have broad discretion. Does the party need to point that out to them and specifically cite 314A in every case? Or doesn't the PTO know by now in light of our precedent that it's got broad discretion? I guess I'm really trying to go to the heart of your waiver point. You're upset they didn't point to 314A in particular and acknowledge and point out to the director his discretion. But do you think that argument really has to be made in every case? Absolutely. Absolutely. And I'm not making the argument here today, Judge Moore, that the board is not aware of its discretion. I think any person watching the board's activities is well aware that the board knows that they have discretion. The issue is how that discretion should be used and how the board should... In your view, though, instead of just arguing this with BARD, they should have said, in light of these factors, you should just exercise your discretion. Whatever factors they think suggest that this case or that these petitions should not have been granted, that's exactly what the board requires parties to do in NHK Offensive. They tell petitioners, set aside part of your petition and explain to us how we should use our discretion. And so, the board, even if it has discretion, party has to tell the board why it is that it would be better for the board to deny than to grant. Because, for example, in this case, if they'd said you should deny, there would be perhaps arguments that could be made the other way. But that wasn't what they said to the board. What they said to the board is that it was prevented from instituting. So, your argument is it's really unfair to your clients, in particular, if we were to entertain this discretion argument, because you may well have had arguments to make sort of policy-oriented or overall workload-oriented or whatever that weren't simply directed to whether it's BARD or not, but were directed to what a good practice would be vis-a-vis granting or denying based on discretion, and you didn't have an opportunity to make those arguments. Is that right? It's more than that, Your Honor. It's that the board didn't have an opportunity to decide it. So, there's nothing for this court to review. I mean, regardless of what we might have said, we don't know what the board would have said. We don't know if the board would have said, absolutely, we'll deny it, or, you know, we don't think this is ever a discretionary issue. We just don't know. So, yes, Your Honor, we couldn't respond to that. But more importantly, the board couldn't respond to that. And that is really the heart of the forfeiture doctrine, right, is that a reviewing tribunal should at least be given the opportunity to make a decision when it's appropriate to do so. And so, I would submit two things, Judge Moore. First, there's nothing for this court to review when it comes to discretion because it was never argued. And secondly, and this brings me back to my initial point, this is not a reviewable issue. I don't know how this court would even grapple with a review of a discretionary issue. And just from what I can see watching the court, it has declined every single time to grapple with the scope of the discretion and specifically how it was exercised in any individual case. So, I don't even begin to know how the court would review a discretionary decision, having never done so. Okay. Any more questions for Mr. Kelly? No. All right. Then, Mr. Dowd, you have rebuttal time. Thank you, Your Honor. Let me respond to a couple of points that my In terms of our request to stay the proceedings in the district court, that was a request to partially stay. And there's no question that New Vision at the time thought that would be the most efficient route because it asked to partially stay the patent proceedings while it went to the board to try to explain to the board that given the forum selection clause, the board should not institute the proceeding. So, that's just a slight clarification that we've made in our brief. But in terms of SG's argument about us waiving a particular argument or us having to explain to the board that it has discretion to decide this issue, I think, you know, at worst, New Vision's brief arguments may have been inartful, but there is no question that the thrust of the argument was that given a forum selection clause, the board should not institute. And whether that becomes a per se rule or a rebuttable presumption or part of the discretion, it was all the same argument. So, we have never really waived that argument. And if I may, I'd like to respond to two points from my colleague from the PTO. So, the PTO identified several cases, Caput, Doolin, Van Harken, that purportedly support their side of the argument. What I would suggest and emphasize is that how our case is different is that you have leadership APJ who are wearing two hats are in control of a substantial portion of the board's revenues and budget. And in this respect, this case is probably more like the reasoning that was applied by the Fifth Circuit in two recent cases in 2019, and that's Gleas versus Cantrell and Cain versus White. And I see my time is up. No, please continue the thought. Thank you, Judge Newman. And in Cain versus White, for example, Judge Graves explained that even though none of the judges received any benefit, any personal benefit to the fines and fees that were imposed during the court proceedings, the judges indirectly ignored a benefit because the funds went through a judicial fund, and those funds helped support the judges' staff and courtroom expenses. So, in this respect, it's very similar to Cain versus White and Gleas versus Cantrell. Now, I will, of course, acknowledge that those are not federal agency decisions, and I'll end on one last point in that of all of the cases that we reviewed, all the cases that have been raised before this court, and in particular, all of the other agencies and their statutory schemes that are set forth, I believe it's in footnote 7 in the PTO's brief. None of those instances involve a federal agency that is statutorily structured to operate as a business, and that is one element that is critically important here. And when you see an agency operating as a business, the problem is you have essentially a pay-for-play system, where petitioners and patent owners, depending on the circumstances, they see the ultimate decision or even the initial decision somewhat affected by business considerations. In the private sector, there's not a problem with that, but in the government sector, that raises substantial problems of the appearance of impartiality. Does this label as a business do any... What concrete work does that do? I mean, it's kind of a nice, helpful word from your perspective, but it seems to me it by itself doesn't actually say anything at all about the concrete operations, all of which I think we've discussed fairly extensively here. So I'm not sure that this phrase, as a business, is helpful except for its sound quality, which doesn't seem like it does any work. Judge Toronto, I'd respectfully push back a little bit on that because it's much more than a soundbite, because it really goes to the flow of money to and from the agency. And this is what distinguishes our case from all of the cases that the government does cite that, in their view, rule against us. When you have an agency, and particularly when you have the PTAB itself running as a business unit, the leadership and even the APJs, they know that their finances must balance. And that's one thing that particularly distinguishes our case from all the other federal agency cases, including Delaware Riverkeeper. With that, Your Honor, unless there are any further questions, I thank you for the generosity and the time today, and I will... Any more questions? Anything else for Mr. Dowd? No. Okay. Thanks to all three counsels. The case is taken under submission.